12 F.3d 205
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Tina L. KANNAPEL, Plaintiff-Appellant,
v.
Henry E. HUDSON, Director of the United States Marshal
Service, Defendant-Appellee,
and
Joe Lucero, Chief, Seized Assets Division, United States
Marshals Service; Kenneth C. Holecko, Associate Director,
Human Resources, United States Marshals Service; Gary E.
Mead, Associate Director, Operations Support, United States
Marshals Service; G. Wayne Smith, Associate Director of
Operations, United States Marshals Service; Gerald Elston,
Former Equal Employment Office, United States Marshals
Service; Thomas Mulhern, Chief, Labor Relations Branch,
United States Marshals Service; James A. Hart, Sergeant,
Enforcement Division, United States Marshals Service, Defendants.
 No. 93-1160.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 26, 1993.
December 3, 1993.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.
 Alan Gordon Warner, for Appellant.
 Rebeca Olivia Hidalgo, Assistant United States Attorney, for Appellee.
 Jeanne Sandy, for Appellant.
 Kenneth E. Melson, United States Attorney, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Tina L. Kannapel (Kannapel) appeals both the district court's grant of summary judgment in favor of the United States Marshals Service (USMS) on her claim alleging sex discrimination against that agency, and the adverse judgment after jury trial on her sexual harassment/hostile work environment and retaliation claims.[1] Finding no error, we affirm.[2]
 
 
 2
 * Because this appeal involves the organizational framework of the USMS, it is helpful to begin our discussion with an overview of the particular division of the USMS for which Kannapel worked.
 
 
 3
 * Structure of the Threat Analysis Division
 
 
 4
 The Threat Analysis Division within the USMS has the primary responsibility for conducting investigations of criminals or criminal groups which pose a threat to the lives of USMS personnel and those under the protection of the USMS, including Federal Judges, United States Attorneys and protected witnesses. The USMS relies on this information in making tactical and managerial decisions to counter perceived threats to its protectees.
 
 
 5
 In August 1989, the Associate Director for Operations of the Threat Analysis Division separated that division into two branches: the Intelligence/Investigations Branch and the Research/Analysis Branch. The Intelligence/Investigations Branch primarily conducted investigations on threats to USMS personnel and its protectees. The Research/Analysis Branch primarily gathered and analyzed information on such threats.
 
 
 6
 Upon the formation of the two branches, the position of Branch Chief was created for each branch. The Intelligence/Investigations Branch Chief position, officially titled "Supervisory Criminal Investigator," was graded at the GM-14 level. The Research/Analysis Branch Chief position, officially titled "Supervisory Intelligence Research Specialist," was graded at the GM-13 level. Such grade and corresponding salary levels were posted before the USMS hired personnel to fill these positions.
 
 
 7
 The Intelligence/Investigations Branch Chief supervised four case officers, all males having either a GS-12 or GS-13 grade level.[3] The case officers conducted investigations of threats made to USMS personnel or protectees. As criminal investigators, the case officers were required to have law enforcement qualifications and training, including the use of weapons and arrest powers. On each assignment, the case officer developed the strategy of the investigation, determining who would be interviewed and in what order. In addition to conducting investigations, the case officers assessed the level of threat presented by the subjects of the investigations. Upon completing an investigation, the case officer prepared a report of the investigation, known as "the threat assessment," and endorsed the report with his signature. Only case officers were authorized to endorse the threat assessment. The case officers were solely responsible for the integrity of the investigation, the content of the investigative report, and the assessment of the degree of threat. In the event a fatality resulted from the improper determination of the level of threat, the case investigator was held accountable for the investigation and the report. The Intelligence/Investigations Branch Chief reviewed the threat assessments prepared by the case officers to ensure that a thorough investigation had been conducted and that the assessment of the threat level was appropriate.
 
 
 8
 The Research/Analysis Branch Chief also supervised various personnel. Specifically, during the course of her employment as Research/Analysis Branch Chief, Kannapel supervised a maximum of three to four analysts and two data transcribers. Initially, upon becoming Branch Chief, Kannapel was assigned three analysts as subordinates, all females. Two of the case analysts were graded as GS-9s and the other was a grade GS-12. At the time Kannapel accepted the position of Branch Chief, the USMS had already hired these analysts and she knew their qualifications and salary grades.
 
 
 9
 In the latter part of 1990, Kannapel also supervised three Department of Defense (DOD) employees who were detailed to the Research/Analysis Branch. One DOD employee was an intelligence analyst and the other two were data transcribers. The DOD intelligence analyst was equivalent to a GS-9 grade level while the two data transcribers were equivalent to GS-4 and GS-5 personnel on the DOD pay system. Thus, during her tenure as Research/Analysis Branch Chief, Kannapel supervised only one employee at the GS-12 level, three employees at the GS-9 level, one employee at the GS-5 level, and one employee at the GS-4 level.
 
 
 10
 The regular case analysts and the DOD intelligence analyst under Kannapel's supervision managed incoming information, ensured that such information was complete and accurate, and prepared charts and graphs. While working under Kannapel's supervision, these analysts devoted eighty percent of their time to their exclusive area of expertise, which included the compilation of information, the retrieval of facts, the preparation of charts, and the use of the computers for information gathering. The two data transcribers on loan from the DOD performed the clerical task of loading highlighted portions of a given document into appropriate computer screens.
 
 
 11
 While the case officer for the Intelligence/Investigations Branch conducted an investigation, the analyst assigned to assist the case officer reviewed the existing files for information. The case officers directed the analysts in the compilation of this information. Other case analysts contributed additional information that often was inserted into the investigative reports. However, the case officers had the sole responsibility for preparing and endorsing the threat assessments.[4] As Branch Chief, Kannapel supervised these subordinate case analysts and data transcribers to ensure that they were providing adequate analytical and research support to a given investigation.
 
 
 12
 Although the personnel in the two branches worked together on particular investigations, each Branch Chief only had supervisory authority and responsibility over the employees in his/her own branch. According to Kannapel, from October 1989 to late 1990, the two Branch Chiefs spent approximately sixty percent of their time supervising their subordinates and the remaining forty percent working on their own case work. However, shortly after Joe Lucero assumed the position of Division Chief in late 1990, the Branch Chiefs were expected to focus primarily on their supervisory responsibilities.
 
 
 13
 The Branch Chiefs also performed various non-supervisory duties. For example, the Intelligence/Investigations Branch Chief was a criminal investigator who served as a senior case officer on actual investigations. The Research/Analysis Branch Chief directly supported the investigations conducted by the Intelligence/Investigations Branch Chief with analytical input.
 
 B
 Facts underlying Kannapel's claims
 
 14
 Kannapel began her employment with the USMS as an Intelligence Research Specialist in the Threat Analysis Division. In that position, Kannapel received a salary at GS-11 grade level. In June 1987, Kannapel received a noncompetitive promotion to a GS-12 grade. In October 1989, Kannapel received a competitive promotion to a GM-13 when the USMS selected her as the new Research/Analysis Branch Chief. Contemporaneous with the selection of Kannapel for the new position, the USMS also selected Ron Collins as the Chief of the Intelligence/Investigations Branch, also through competitive promotion. Prior to being selected as Branch Chief, Mr. Collins was a GS-13 criminal investigator.
 
 
 15
 During her employment as Branch Chief, Kannapel approached her superior, Lucero, on several occasions seeking a salary elevation to the GM-14 level. As a Branch Chief, Kannapel believed she was entitled to the same salary as the Intelligence/Investigations Branch Chief. Lucero initially advised Kannapel to obtain a copy of a GM-14 Intelligence Research Specialist position description and adapt such position description to her position as Branch Chief. Kannapel did as Lucero requested.
 
 
 16
 Lucero subsequently advised Kannapel that she could not be elevated to the GM-14 salary level within the USMS because she was not a law enforcement officer. In September 1991 Lucero modified his stance, advising Kannapel that she could be promoted, but only after the employees in the Intelligence/Investigations Branch and the Threat Coordinators, all of whom were male, were elevated to higher salary levels.
 
 
 17
 On December 19, 1991, Kannapel claims one of the DOD personnel on loan (Sergeant Hart) verbally and physically assaulted her. On December 20, 1991, Kannapel prepared a memorandum detailing the circumstances surrounding the alleged assault as well as previous instances of insubordination and threats by Sergeant Hart. Kannapel requested in her memo that Hart be replaced by another DOD officer. In response, Lucero cautioned Kannapel not to place herself in a situation where she would be alone with Sergeant Hart, but did not accept Kannapel's request to replace Hart.
 
 
 18
 On January 8, 1992, Kannapel filed an administrative complaint with the Equal Employment Opportunity (EEO) Counselor for the USMS. In this complaint, Kannapel detailed the verbal and physical assault by Sergeant Hart, and claimed Lucero had discriminated against her on the basis of sex when he refused to promote her to a GM-14 salary grade. However, the complaint did not allege sex discrimination based on the disparate staffing in the two branches of the Threat Analysis Division.[5]
 
 
 19
 Soon thereafter, Kannapel requested Deputy Marshal Whaley to obtain derogatory information about Lucero and another superior. Having overheard this request, Lucero presented a memorandum to Kannapel directing her to explain the purpose of her request to Whaley. According to Lucero, Kannapel refused to answer his direct instruction. Lucero then presented Kannapel with another memorandum advising her that if she did not respond to his order, she could be subject to disciplinary action. Lucero testified that Kannapel again refused to respond to his inquiry. Kannapel, on the other hand, testified that she did not refuse to respond to Lucero's questions, but advised him that her attorney would respond on her behalf. Kannapel's counsel faxed a letter to Lucero that same day. The letter alleged that Lucero had intercepted Kannapel's telephone conversation with Whaley without authorization, and accused Lucero of retaliating against her.
 
 
 20
 Lucero then initiated disciplinary procedures by reporting the incident to his superiors. In July 1992, after the appropriate authorities investigated the matter, Gary Mead, the Associate Director for Operations Support, found that the charge of failing to answer work-related questions was sustained by the record before him and that a fourteen day suspension was warranted.
 
 
 21
 In April 1992, Kannapel was transferred out of the Threat Analysis Division and into the Management and Planning Division of the USMS. Kannapel's transfer did not result in a reduction in grade or pay.
 
 C
 The proceedings before the district court
 
 22
 On April 6, 1992, Kannapel filed a complaint in the United States District Court for the Eastern District of Virginia, alleging that the USMS violated the provisions of the Equal Pay Act. Kannapel specifically contended that she, as a Branch Chief of the Research/Analysis Branch, performed substantially equal responsibilities as the Branch Chief of the Intelligence/Investigations Branch, but that her salary was lower than that of the other Branch Chief, Ron Collins.
 
 
 23
 On September 1, 1992, Kannapel amended her complaint to include several claims against the USMS under Title VII, 42 U.S.C Sec. 2000e-16. After amending her complaint, Kannapel's causes of action included: (1) sex discrimination (count one); (2) sexual harassment/hostile work environment (count two); (3) retaliation (count three); and (4) disparate pay under the Equal Pay Act (count four). Kannapel predicated her claim of sexual discrimination (count one) solely on two theories: (1) Kannapel received a GM-13 salary while the Branch Chief of the Intelligence/Investigations Branch received a GM-14 salary and (2) Lucero staffed her Research/Analysis Branch with personnel having less qualifications than the employees in the Intelligence/Investigations Branch.[6] In other words, Kannapel claimed Lucero discriminated against her on the basis of sex by refusing to promote her to a GM-14 grade level and assigning to Kannapel's branch only female subordinates who were part-time, low-grade, former clerical employees.[7]
 
 
 24
 On November 20, 1992, the USMS moved for summary judgment on the Equal Pay Act claim (count four) and Kannapel's claim for sex discrimination (count one). By order dated December 4, 1992, the district court granted summary judgment on the sex discrimination claim, but denied summary judgment on the Equal Pay Act claim. The district court identified three alternative grounds for granting summary judgment: (1) the claim had not been timely submitted for administrative consideration; (2) Kannapel failed to state a prima facie case of sex discrimination; and (3) Kannapel had failed to overcome USMS's articulated nondiscriminatory reason for its challenged personnel actions with a showing of pretext.
 
 
 25
 On December 7, 1992, trial began on Kannapel's remaining claims. During Kannapel's case in chief, she attempted to introduce evidence through Ron Collins, the former Chief of the Intelligence/Investigations Branch, intending to establish disparate discipline imposed upon her and a male employee of the Threat Analysis Division. Specifically, Kannapel hoped to show that the male employee, who had been arrested off duty for assault with a deadly weapon and drunken driving, received relatively lighter discipline for his offense than she did, even though his offense was purportedly major while Kannapel's amounted to only a minor act of misconduct. The district court excluded this evidence, reasoning that it was only marginally relevant to Kannapel's claims and that it would distract the jury.
 
 
 26
 After Kannapel rested her case, the USMS moved for judgment as a matter of law on all remaining claims. The district court granted the motion on the Equal Pay Act claim only, leaving the retaliation and sexual harassment/hostile work environment for the jury.
 
 
 27
 On December 9, 1992, Kannapel and the USMS presented their closing arguments. Thereafter, the district court instructed the jury on the elements of Kannapel's two remaining claims. The instructions regarding the sexual harassment/hostile work environment claims included the following remarks:
 
 
 28
 The other claim on which Ms. Kannapel bases her loss is the sexual harassment, which resulted in a hostile working environment. Sexual harassment is one form of unlawful sex discrimination because it requires women to work under adverse job conditions that are not present for men. Sexual harassment occurs when a male employee's unwelcome and sexually-related behavior adversely affects a woman's job or creates an intimidating, hostile or offensive working environment. Behavior that can constitute sexual harassment includes not only sexual advances and requests for sexual favors, but also includes any touching of a sexual nature, comments of a sexual nature, and any other verbal or physical conduct of a sexual nature. In order to recover on this claim, the burden is on the plaintiff to prove by a preponderance of the evidence the following three essential elements: first that the submission by her to such conduct is made either explicitly or implicitly a time or condition of an individual's employment, of hers; second, that submission to or rejection of such conduct by an individual, by her, is used as the basis for employment decisions affecting her, or that such conduct has the purpose or effect of unreasonably interfering with an individual, hers, work performance or creating an intimidating, hostile or offensive work environment. (J.A. 263-65). After charging the jury, the district court inquired whether either side had objections to the instructions. The following discussion ensued with Kannapel's counsel:
 
 
 29
 MR. WARNER: Yes, sir, two: One, that the sexual conduct instruction was too narrow; and the other one was that you didn't put employer or agency in the definition of the ability to find against the defendant on. You only listed it as the employee's part.
 
 
 30
 THE COURT: I'm not sure I understand what you want.
 
 
 31
 MR. WARNER: Let me try again. Under the statute, if the employer or an agent of the employer, then they are considered acts of the employer and if they find that, they need find nothing else. If they don't find it was the employer or acts of the employer, then they must find that there was a failure to take proper action if it was just employees. I think there is enough evidence in the case here that a jury could find that there was an agency, or that it was, in fact, the employer itself that discriminated against her.
 
 
 32
 THE COURT: Well, I didn't instruct them and I perhaps should have that the acts of the plaintiff's supervisors and the management officials are the acts of the United States Marshals Service for the purposes of--I think that will cure it.
 
 
 33
 MR. WARNER: That would cure that, yes, Your Honor. Thank you.
 
 
 34
 (J.A. 269-70). The district court then cured Kannapel's objection. No further objection was made.
 
 
 35
 On December 10, 1992, the jury returned a verdict in favor of the USMS on the two remaining counts. Thus, the jury found that the USMS had not retaliated against Kannapel for her engaging in protected activity and that Kannapel's supervisors had not sexually harassed her by creating a hostile work environment. On December 10, 1992, the district court entered judgment in favor of the USMS in accordance with the jury's verdict.
 
 
 36
 On February 5, 1993, Kannapel filed her notice of appeal. In that document, Kannapel identified the December 10, 1992 judgment against her retaliation and sexual harassment/hostile work environment claims and the December 14 amended judgment against her Equal Pay Act claim. However, Kannapel did not designate the district court's December 4, 1992 summary judgment against her sex discrimination claim on her notice of appeal.
 
 II
 
 37
 * Although Kannapel did not specify the district court's December 4, 1992 summary judgment in favor of the USMS, which dismissed her sexual discrimination claim (count one), on her notice of appeal, Kannapel nonetheless challenges the propriety of that judgment. In response, the USMS asserts that Kannapel waived her right to argue this issue on appeal because she failed to specify the district court's summary judgment on her notice of appeal. We disagree.
 
 
 38
 In Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court addressed the consequences of the failure to specify a particular judgment on a notice of appeal. There, the appellant failed to specify the precise judgment of the district court being appealed, designating an order denying the motion to amend the judgment rather than the judgment itself. The appellee asserted that the appellant waived her right to appeal the judgment by failing to specify the judgment on the notice of appeal. The court of appeals determined that it could not review a judgment unless the appellant designated that judgment on the notice of appeal.
 
 
 39
 The Supreme Court reversed, holding that the defect could be overlooked so long as the faulty notice "did not mislead or prejudice" the appellee. Id. at 181. In reaching this conclusion, the Court opined:
 
 
 40
 The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.
 
 
 41
 Id. at 181-82.
 
 
 42
 Applying this principle, several lower courts recognize that an error designating the judgment or part thereof will not result in a loss of appeal if "the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced by the mistake." Lynn v. Sheet Metal Workers' Intl. Ass'n, 804 F.2d 1472, 1481 (9th Cir.1986). See also, Badger Pharmacal, Inc. v. Colgate-Palmolive Co., 1 F.3d 621, 625 (7th Cir.1993). In determining whether "intent" and "prejudice" are present, courts usually examine "whether the affected party had notice of the issue on appeal; and ... whether the affected party had an opportunity to fully brief the issue." Lynn, 804 F.2d at 1481. When the appellant addresses the merits of a particular judgment in its opening brief, "this is enough to demonstrate that the appellee had notice of the issue and did not suffer prejudice...." Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 691 (9th Cir.1993).
 
 
 43
 In the present case, Kannapel argued the merits of the summary judgment against her sexual discrimination claim in her opening brief, and the USMS fully responded to her claim of errors in its brief. Thus, the USMS clearly had notice of the issue and was not taken by surprise or in any way prejudiced. Accordingly, Kannapel's failure to designate the district court's December 4, 1992 order granting summary judgment in favor of the USMS on her sex discrimination claim does not waive her right to assert this issue on appeal.[8]
 
 B
 
 44
 Turning to the merits of the appeal, Kannapel challenges each of the three alternative grounds on which the district court relied in granting summary judgment on her sexual discrimination claim. The district court identified three reasons for granting summary judgment: (1) failure to timely submit such claims; (2) failure to state a prima facie case of discrimination; and (3) failure to overcome USMS's articulated nondiscriminatory reason for its challenged personnel actions with a showing of pretext. Because we conclude that Kannapel failed to timely submit her discrimination claims, we need not address the other two grounds for granting summary judgment.
 
 
 45
 The provisions of Title VII of the Civil Rights Act applicable to the federal government, 42 U.S.C. Sec. 2000e-16, provide, in pertinent part:
 
 
 46
 All personnel actions affecting employees or applicants for employment ... in those units of the legislative and judicial branches of the federal government having positions in the competitive service ... shall be made free from any discrimination based on ... sex....
 
 
 47
 42 U.S.C. Sec. 2000e-16(a). This statute also authorizes the Equal Employment Opportunity Commission (EEOC) to "issue such rules, regulations, orders and instructions as it deems necessary...." 42 U.S.C. Sec. 2000e-16(b). Pursuant to this authority, the EEOC requires a complainant to bring to the attention of the EEO counselor for the employing agency:
 
 
 48
 [T]he matter causing ... her to believe ... she had been discriminated against within thirty calendar days of the date of the alleged discriminatory event, or the date that the aggrieved person knew of the discriminatory event or personnel action....
 
 
 49
 29 C.F.R. Sec. 1613.214(a)(i). The complainant must bring the matter to the attention of the EEO counselor for the employing agency by filing an administrative complaint with that counselor. Id. Thus, the "right to bring an action under Title VII regarding equal employment in the federal government is predicated upon the timely exhaustion of administrative remedies, as set forth in 29 C.F.R.Sec. 1613.214(a)(i)." Benford v. Frank, 943 F.2d 609, 612 (6th Cir.1991).[9]
 
 
 50
 On appeal, Kannapel claims she satisfied the time requirements even though she filed her administrative complaint on January 8, 1992, almost three years after her selection as Branch Chief. In support, Kannapel offers two theories. We address each in turn.
 
 
 51
 * Kannapel first theorizes that she filed a timely administrative complaint because she did not learn of Lucero's true reason for denying her a promotion or for providing her inadequate staffing until one week before filing her complaint. Kannapel explains that Lucero's initial response to her request for a promotion, e.g., requesting her to adapt a GM-14 position description, concealed the actual basis for denying her a promotion: sexual discrimination.[10] Because the thirty-day period does not begin running until "the aggrieved person knew or reasonably should have known of the discriminatory event," Kannapel argues that the period did not begin to run until her attorney informed her, one week before filing her complaint, that she had a viable sexual discrimination claim. We disagree.
 
 
 52
 We have previously recognized that "courts cannot countenance ad hoc litigation for every missed deadline [because] the repose that statutes of limitations provide will be lost if their applicability is 'up for grabs' in every case." Olson v. Mobil Oil Corp., 904 F.2d 198, 201 (4th Cir.1990). Accordingly, in other contexts, we have held that the time for filing an administrative complaint begins"when the employee is informed of his termination ... even if he is not then aware of its discriminatory nature." Id. at 200 (citations omitted). As we have noted:
 
 
 53
 A plaintiff's lack of knowledge of the discriminatory nature of an employment decision and the reasons for the lack of knowledge ... play no part in determining the beginning of the statutory limitation period.
 
 
 54
 Felty v. Graves-Humphrey's Co., 785 F.2d 516, 519 (4th Cir.1986). See also, Hamilton v. 1st Source Bank, 928 F.2d 86, 88-89 (4th Cir.1990)("To the extent that notice enters the analysis, it is notice of the employer's actions, not the notice of discriminatory effect or motivation, that establishes the commencement of the pertinent filing period.")
 
 
 55
 Under these principles, Kannapel's ignorance of any discriminatory motive in refusing to promote her to a GM-14 or providing her inadequate staffing does not affect the beginning of the thirty-day period for filing administrative complaints. Thus, the statute of limitations with respect to her discrimination claim based on the disproportionate pay/failure to promote theory began to run no later than September 1991, when Lucero informed Kannapel that she could not obtain a promotion until the case officers in the Intelligence/Investigations Branch were promoted. The time for filing the discrimination claim based on the inadequate staffing theory began to run when she accepted her new position because these personnel had been hired before Kannapel assumed the Branch Chief position. Because Kannapel did not file her complaint until January 1992, she clearly missed the deadline on both theories.
 
 2
 
 56
 In the alternative, Kannapel claims that either the time limit was equitably tolled or the USMS should be equitably estopped from asserting timeliness. Kannapel asserts that the equitable tolling or estoppel occurred when either: (1) the EEO counselor, upon receiving Kannapel's complaint, did not advise her that she could request a waiver of the time requirements pursuant to 29 C.F.R. Sec. 1613.214(a)(4); or (2) the EEO counselor began a formal investigation into Kannapel's complaints, thereby suggesting timeliness was not an issue. Thus, Kannapel concludes that her sex discrimination claim is not barred by the thirty-day filing requirement. We disagree.
 
 
 57
 Generally, when an employee fails to timely submit her administrative complaint, we will forgive the delinquency only if (1) the government should be equitably estopped from asserting the time bar, (2) the time for filing should be equitably tolled, or (3) if plaintiff did not know about the time requirement.[11] Nealon v. Stone, 958 F.2d 584, 589 (4th Cir.1992). None of these conditions exist in the present case.
 
 
 58
 We have previously recognized that "the doctrines of equitable tolling and equitable estoppel have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in conduct that prevents the plaintiff from filing his or her claim on time." English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir.1987). Equitable tolling applies "where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." Id. (citations omitted). Thus, we have held "[t]o invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead [her] and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge." Id. (citation omitted).
 
 
 59
 In contrast, "equitable estoppel applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." Id. (citation omitted). To establish equitable estoppel, the plaintiff must establish "affirmative misconduct on the part of the government." Olson, 904 F.2d at 201. Such misconduct usually exists"where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin v. Veterans Admin., 111 S.Ct. 453, 458 (1990). See also Olson, 904 F.2d at 201 (Estoppel applies only when the employer "wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.").
 
 
 60
 Under these tests, we conclude that neither of the EEO counselor's acts cited by Kannapel justifies the application of equitable tolling or equitable estoppel to the present case. At least one sister circuit has supported this view by recognizing that an EEO counselor's decision to investigate a complaint does not create a claim for equitable estoppel or equitable tolling. Rowe v. Sullivan, 967 F.2d 186, 191 (5th Cir.1992). Moreover, the EEO counselor's mere failure to advise Kannapel of her ability to request a waiver does not qualify as "affirmative misconduct" sufficient to estop the government, or any "attempt to mislead" sufficient to apply equitable tolling.
 
 
 61
 Moreover, we do not think Kannapel was entitled to an extension of the filing deadline. Pursuant to 29 C.F.R. Sec. 1613.214(a)(4), the USMS must extend the time for filing if Kannapel "was not notified of the time limits and was not otherwise aware of them." Id. (emphasis added). Under this regulation, when a plaintiff claims she was unaware of the filing deadlines, a court may not grant summary judgment on the basis of her failure to file a timely complaint unless the employer can show it notified its employees of the time requirements. Polsby v. Chase, 970 F.2d 1360, 1364 (4th Cir.1992).
 
 
 62
 However, in the present case, Kannapel never alleged an unawareness of the filing deadlines. Instead, Kannapel only claims an extension is warranted because she:
 
 
 63
 [W]as mislead by Mr. Lucero concerning her ability to be compensated at the GM-14 level and was unaware that the professional composition of her subordinates was created for discriminatory purposes until she discussed these issues with counsel [and] was [not] advised by the [USMS] that she could request a waiver of the time limitations....
 
 
 64
 (Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment, J.A. 149). Because Kannapel does not allege unawareness of the filing deadlines, she cannot obtain an extension of the deadline under 29 C.F.R.Sec. 1613.214(a)(4).[12]
 
 
 65
 Accordingly, we conclude that the USMS is not equitably estopped from asserting Kannapel's untimeliness in filing her administrative complaint as a defense to the sexual discrimination claim and equitable tolling does not apply. Moreover, Kannapel is not entitled to an extension of the filing period. Thus, because she failed to file her complaint within the prescribed time limits, we conclude that the district court properly granted summary judgment in favor of the USMS on the sex discrimination claim.
 
 III
 
 66
 Kannapel next claims that the district court erred when it excluded the testimony of Ron Collins. Collins would have testified that the USMS administered significantly more severe discipline to Kannapel for a relatively minor offense than it did to a male employee for more serious offenses. The district court excluded this testimony, reasoning that it was only marginally relevant and would distract the jury from the remaining issues in the case. (J.A. 239-40). On appeal, Kannapel asserts that such evidence would have:
 
 
 67
 [D]emonstrated to the jury conclusive proof that the Appellant was not treated the same as the males in the Threat Analysis Division with respect to the severity of discipline upon males and females.
 
 
 68
 (Brief of Appellant 32). Thus, Kannapel concludes that the exclusion of such evidence warrants reversal. We disagree.
 
 
 69
 Federal Rule of Evidence 401 defines relevant evidence to include:
 
 
 70
 [E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 
 
 71
 Under Fed.R.Evid. 402, a district court must exclude evidence which it considers irrelevant. A district court may also exclude evidence under Fed.R.Evid. 403, which provides, in pertinent part:
 
 
 72
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....
 
 
 73
 We review a district court's decision to exclude evidence for an abuse of discretion. United States v. Lopez, 611 F.2d 44, 46 (4th Cir.1979).
 
 
 74
 Under this standard, the evidence in question was, at best, marginally relevant to Kannapel's sexual harassment/hostile work environment and retaliation claims and created a strong probability of misleading the jury. For example, the offenses committed by Kannapel (failing to answer work related questions) and the male employee in question (off-duty arrest for assault with a deadly weapon and drunken driving) were entirely different. Thus, the evidence did not establish that Kannapel was treated differently than a similarly-situated male employee.
 
 
 75
 In addition, the uncontradicted evidence indicates that, in determining the appropriate punishment, the USMS considers more than just the offense committed. Gary Mead, the USMS official who decided Kannapel's punishment, testified that, in determining what disciplinary action to take, he considered several other factors, including whether:
 
 
 76
 [T]he employee had shown remorse; the employee had provided an explanation for the misconduct; there was an indication that the misconduct would reoccur; and the employee had any prior disciplinary record and employment history.
 
 
 77
 (Dec. 8 T.T. 216-17).
 
 
 78
 These facts indicate that Kannapel's proffered testimony had little, if any, probative value for her sexual harassment/hostile work environment and retaliation claims and created a high probability of confusion by the jury. Specifically, the fact that many different factors affected the amount of punishment which Kannapel and the other male employee received makes it highly questionable whether the USMS's decision to administer more severe discipline to Kannapel stemmed from any retaliation or sexual harassment. Thus, we conclude that the district court did not abuse its discretion when it excluded Collins' testimony on the grounds of relevance.
 
 IV
 
 79
 As a last argument, Kannapel claims the district court erred when it instructed the jury that a claim for sexual harassment requires proof of unwelcome and sexually-related behavior. Kannapel reasons that there are two kinds of sexual harassment: (1) conditioning tangible benefits on submission to unwelcome sexual requests or conduct and (2) harassment that, while not affecting economic benefits, nonetheless creates an intimidating, hostile or offensive working environment. (Brief of Appellant 32-33). Because Kannapel's sexual harassment claim involved the latter type of harassment, she concludes the district court committed reversible error when it instructed the jury that she had to be the victim of sexual advances to prevail. We disagree.
 
 
 80
 The Federal Rules of Civil Procedure specifically provide:
 
 
 81
 No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.
 
 
 82
 Fed.R.Civ.P. 51. Applying this rule, courts routinely recognize that a failure to assert a specific objection to a jury challenge precludes any challenge to that instruction on appeal. See, e.g., Abraham v. Pekarski, 728 F.2d 167, 172 (3d Cir), cert. denied, 467 U.S. 1242 (1984); Hidalgo Prop., Inc. v. Wachovia Mortg. Co., 617 F.2d 196, 201 (10th Cir.1980); Bergstralh v. Lowe, 504 F.2d 1276, 1279 (9th Cir.1974), cert. denied, 420 U.S. 930 (1975).
 
 
 83
 In the present case, the record reveals that Kannapel failed to raise the specific objection to the jury instruction which she now raises on appeal. Although Kannapel's counsel informed the district court that he believed "the sexual conduct instruction was too narrow," when asked to clarify the objection, the attorney only referred to the district court's failure to instruct the jury that Kannapel's supervisors' acts could be attributed to the USMS itself. (J.A. 269-70). When the district court offered a specific cure to this objection, Kannapel's counsel stated: "That would cure that, yes, Your Honor." (J.A. 270). After the district court gave the additional instruction, Kannapel's counsel offered no further objections. Because Kannapel failed to raise the specific objection to the jury instruction to the district court which she now presents on appeal, Fed.R.Civ.P. 51 precludes us from considering this issue.
 
 V
 
 84
 For the reasons mentioned herein, we affirm the judgment of the district court.
 
 AFFIRMED
 
 
 [1]
 Although Kannapel named several individual defendants in her complaint, her claims against them stemmed from their acts as USMS supervisors. Because Kannapel relies on the acts of these individuals to impose liability on USMS itself, we shall refer to the appellees collectively as the USMS
 
 
 [2]
 On her notice of appeal, Kannapel indicated an intent to appeal the judgment as a matter of law against her Equal Pay Act claim. However, she apparently abandoned this claim on appeal because neither her briefs nor her oral argument contained any discussion of this claim
 
 
 [3]
 The salary grades for these employees were subsequently converted to GM-13. (Supp.App. 31)
 
 
 [4]
 Consequently, the case analyst could not be held to answer for an incorrect assessment of the threat level
 
 
 [5]
 The USMS failed to render a final decision on Kannapel's administrative complaint within 180 days of filing. Absent timeliness concerns, such a failure satisfies the exhaustion requirement and allows a complainant to seek judicial review
 
 
 [6]
 The Intelligence/Investigations Branch contained all male, full-time, professionally trained, GM-13 criminal investigators
 
 
 [7]
 Kannapel does not apparently contend that the alleged assault by Sergeant Hart, or Lucero's handling of that matter, constituted sexual discrimination. Instead, Kannapel relied on this incident to support her retaliation and sexual harassment/hostile work environment claims
 
 
 [8]
 As a final point, we note that the clerk of the court for the United States District Court for the Eastern District of Virginia failed to enter a judgment dismissing Kannapel's sex discrimination claim. This failure violates the requirements of Fed.R.Civ.P. 58, which states: "the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court." Fortunately, the failure to enter a judgment does not affect our analysis. Hopefully, the clerk of this court will see fit to comply with Fed.R.Civ.P. 58 in the future
 
 
 [9]
 Notably, exhaustion of administrative remedies does not require the complainant to appeal an adverse determination by the employer. Instead, after the employer rejects a complaint, the complainant may seek judicial relief. 29 C.F.R. Sec. 1613.281(a)
 
 
 [10]
 The record does not reveal whether Kannapel ever requested more highly trained staffing
 
 
 [11]
 29 C.F.R. Sec. 1613.214(a)(4) provides:
 The agency shall extend the time limits in this section when the complainant shows that ... she was not notified of the time limits and was not otherwise aware of them....
 
 
 [12]
 Kannapel relies on Ettinger v. Johnson, 556 F.2d 692, 698 (3d Cir.1977), for the proposition that the USMS' failure to affirmatively tell her of her right to request a waiver from the filing deadline precludes that agency from asserting timeliness as a defense. Kannapel misinterprets Ettinger. Instead of imposing an affirmative duty to inform employees of their right to request a waiver, Ettinger indicates that, when an employee claims ignorance of the filing requirement and the employing agency never informed the employee of the filing deadline, a triable issue of fact exists as to whether the employee knew of the filing deadlines, thereby entitling the employee to a waiver under 29 C.F.R.Sec. 1613.214(a)(4). As we have discussed, Kannapel never alleged that she was unaware of the filing deadline. Thus, Ettinger has no application to the facts before us